**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IRENE HAMBURGER and HOWARD HAMBURGER,** | : |
| **Plaintiffs,** | : |
| **v.** | : **3:13-CV-01155** |
| | : **(JUDGE MARIANI)** |
| **NORTHLAND GROUP, INC.,** | : |
| **Defendant.** | : |

## MEMORANDUM OPINION

### I.    Introduction

Presently before the Court is a Motion for Summary Judgment (Doc. 35) filed by

Defendant Northland Group, Inc., in this fair debt collection case. For the reasons

discussed below, the Court will grant the Motion in part and deny it in part.

### II.    Procedural History

Plaintiffs Irene and Howard Hamburger, a husband and wife, filed this lawsuit after

they allegedly received a series of phone calls from Defendant Northland Group, a debt

collection company. The Defendant sought "to collect a debt of an individual named

'Henry.'" (Compl., Doc. 1, at ¶ 15.) But, as represented in the Complaint, "[n]either Plaintiff

is named Henry nor do they know an individual by that name." (*Id.* at ¶ 16.) Their

Complaint therefore alleged multiple violations of the Fair Debt Collection Practices Act

("FDCPA") (Counts I-IV) and a pendent state tort claim for Invasion of Privacy by Intrusion

upon Seclusion (Count V). During discovery, it came to light that, contrary to their representations in the Complaint, Plaintiffs do indeed know some individuals named Henry, including their own son, Henry Hamburger.[1] Henry submitted an affidavit claiming to "have personal knowledge regarding the charges" that were the subject of the collection calls, but omitted to mention whether the debts for which he possesses personal knowledge are in fact his. (*See* Henry Hamburger Aff., Doc. 37-3, at ¶¶ 8-10.) He merely states that the "credit card was used to make personal purchase" only, and that "[n]o charges on the credit card . . . were made for business purposes." (*Id.* at ¶¶ 9-10.)

Defendant then filed the instant Motion for Summary Judgment, which seeks judgment on all claims alleged in the Complaint. (*See* Mot. for Summ. J., Doc. 35, at 1.)

## III.  **Statement of Undisputed Facts**

The following facts are not reasonably in dispute.[2]

---

[1] In his deposition testimony, Howard Hamburger testified that the automated calls he received from the Defendant began by stating "We're looking for Henry Hamburger." (Howard Hamburger Aff., Doc. 37-8, at 16:24.) Accepting the nonmovant Plaintiff's sworn representations as true, it strains credulity to believe that the Plaintiffs were not aware at the time that they filed the Complaint that the "Henry Hamburger" that Defendant sought could possibly be their identically-named son.

[2] The Court's analysis of the undisputed facts is complicated by Plaintiffs' tendency, throughout their Answer to Defendant's Statement of Facts, to "deny" nearly all of Defendant's facts, but then add qualifications that indicate that the facts are not really in dispute. For instance, Defendant avers, "As evidence that the Account is a 'debt' as defined by 15 U.S.C. § 1692a(5), Plaintiffs produced an Affidavit by Henry Hamburger. The affidavit testimony, however, is not admissible." (Def.'s Statement of Mat. Facts, Doc. 36, at ¶ 6 (internal citation omitted).) Plaintiffs respond, "Denied as a fact and as a conclusion of law." (Pls.' Answ. to Def.'s Statement of Mat. Facts, Doc. 38-8, at ¶ 6.) But, as to the factual portion of the averment, Plaintiffs then spend nearly two pages summarizing the content of the Henry Hamburger Affidavit, and explaining how the Affidavit demonstrates that the debts at issue were for personal transactions, (*see id.*)—all of which indicates that the Affidavit was submitted to demonstrate compliance with § 1692a(5), as Defendant originally represented. At another point, Plaintiffs deny "as a fact and as a conclusion of law" the averment that "At no time was Northland attempting to collect on any debt or alleged debt owed by either of the Plaintiffs." (*See* Doc. 36 at ¶ 53; Doc. 38-8 at ¶ 53.) But Plaintiffs allege in their

Defendant opened an account for a third party credit card company to collect debts incurred by Henry Hamburger. (Doc. 36 at ¶ 1.)[3] In an attempt to collect these debts, Defendant made multiple calls to Plaintiffs Howard and Irene Hamburger at their home telephone number, beginning in or around March 2013. (See id. at ¶¶ 8-12.) The calls specified that they were intended for Henry Hamburger. (See Doc. 38-8 at ¶ 29.) The parties dispute the number of calls that were placed and whether those calls were answered. (Cf. generally Doc. 36 at ¶¶ 12-20; Doc. 38-8 at ¶¶ 12-20.) However, the parties agree that on April 2, 2013, a man at Howard and Irene's phone number spoke with Northland debt collector Nilton Vega and informed Mr. Vega that Northland was calling the wrong number. (Doc. 36 at ¶ 22; Doc. 38-8 at ¶ 22.)

Plaintiffs admit that they "were receiving telephone calls from collection agencies other than Northland during between January 2013 and April 2013." (Doc. 36 at ¶ 38.) To differentiate Northland from these other collectors, Irene Hamburger testified to having

---

own Complaint and throughout their briefs that they did not owe the underlying debt. Thus, for instance, they write in the Complaint that "information was readily available to Defendant and/or was available in the public domain, revealing that the number called either belonged to someone who was not [Defendant's] debtor, or in fact identified Plaintiffs by name, giving Defendant reason to know it was calling persons who were not the debtor." (Compl. at ¶ 28.)

In determining which facts are the subject of a genuine dispute for summary judgment purposes, the Court looks to the record as a whole and will not accept a "denial" at face value if the record shows that Plaintiffs' denial is based on obfuscation, mischaracterization, or some other strained interpretation of indisputable facts.

[3] Again, though the Plaintiffs categorically deny this allegation, they state in the course of their denial that the underlying debt was in fact placed with Defendant by a third party company. (Doc. 38-8 at ¶ 1). They later acknowledge that "the underlying debt was an account for their son." (Id. at ¶ 3.) Thus, despite Plaintiffs' denial, the Court's formulation of the fact does not appear to be in reasonable dispute.

3

recorded Northland's number each time it called "because it called so many times," but she "is unable to locate the piece of paper" providing this record. (*See* Doc. 38-8 at ¶ 37.)

## IV.   **Statement of Disputed Facts**

Aside from the facts enumerated above, several other issues of fact remain in dispute.

First, there is a dispute about how many calls were actually placed. Northland argues that it only placed five calls to Plaintiffs' phone number, on March 11, March 14, March 25, March 29, and April 2, 2013. (Doc. 36 at ¶ 12.) It provides as evidence for this assertion a copy of its Account Notes for the Henry Hamburger account. (*See generally* Doc. 37-1, Ex. A.) Plaintiffs, on the other hand, argue that Defendant called them "at least seven or eight" times. (*See* Doc. 38-8 at ¶ 12.) Plaintiffs' only support for their factual assertions appears to be their own testimony. In this respect, it should also be noted that even though Plaintiffs characterize their testimony as indicating that "Defendant made at least seven or eight calls to Plaintiffs, after Plaintiffs told them they were calling the wrong number," (Doc. 38-8 at ¶ 12), the cited deposition testimony does not support this assertion. Irene Hamburger only testified that she "logged or wrote down" "about seven or eight [calls] that I remember." (Irene Hamburger Dep., Doc. 37-5, at 22:3-6.) It is apparent from the context of her deposition that she is referring to the total number of calls she wrote down as coming from Northland, and not to calls received only after Northland was told to stop

4

calling.  Nor does she use the phrase "at least," though the conclusion that other non-logged calls occurred possibly could be inferred from reading other parts of her testimony.

Relatedly, the issue of how many of these calls led to conversations between a Northland representative and one of the Plaintiffs may be in dispute.  Defendant states that no conversations took place during the first four calls listed above.  (See Doc. 36 at ¶ 17.) Plaintiffs deny this on the grounds that Defendant's own records show that these calls were answered.  (Doc. 38-8 at ¶ 17.)  However, in the course of their denial, Plaintiffs also indicate that the calls being received were in the form of automated messages and that "Plaintiff Howard Hamburger testified that several times when he received an automated message for Henry Hamburger that [sic] he would press a number and hang up the phone to alert the collector it was calling the wrong number." (Id.; see also Howard Hamburger Aff. at 16:14-18 (testifying that "I got automated calls" from Northland).)  Defendant also states that its calls are automated and that the recipient would have to take further action before speaking to a representative.  (Doc. 36 at ¶ 29.)  Accordingly, the fact that the calls "were answered" does not show that a conversation took place.  Plaintiffs' "denial" that only one phone call led to a conversation may therefore be a mischaracterization.

Finally, there are disputes over when and in what manner the Plaintiffs informed the Defendant that Henry Hamburger did not live at their residence and whether the Defendant continued to call the Plaintiffs after being so informed.  It is undisputed that Nilton Vega was informed on April 2, 2013 that Henry Hamburger did not live at the Plaintiffs' address.  (See

5

Doc. 36 at ¶ 22.)  The person speaking with Mr. Vega was "a man," (id.), most likely Howard

Hamburger, who testifies that he told Mr. Vega, "Stop calling me.  Leave us alone," and

informed him that no one named Henry lived at his house.  (Howard Hamburger Dep. at

16:3-10.)  However, Irene Hamburger—a woman—testifies that she had to speak with

Nilton Vega at least two other times to tell Northland to stop calling.  (Irene Hamburger Dep.

at 18:18-21:19.)  She also testifies to responding to the automated calls by pressing the

prompted numbers to be taken off the call list.  (Id. at 17:8-11.)  But as to these latter calls,

she also testified that she cannot be sure that they were from Northland or a different debt

collector.  (Id. at 17:12-25.)   According to the Defendant's description of its automated calls

(which Plaintiffs deny, (see Doc. 38-8 at ¶ 29)) the call recipient can only inform Northland

of a wrong number by dialing a separate 1-800 number, and not by pressing a single key as

Mrs. Hamburger testifies to have done, (see Doc. 36 at ¶ 29).

     In contrast to Plaintiffs' claims of making multiple requests to be taken off the call list,

Northland states that a search of its records reveals that Plaintiffs only called to report a

wrong number once, which appears to be the April 2, 2013 conversation between Nilton

Vega and the unidentified man. (See Doc. 36 at ¶ 27.)  Northland likewise claims that a

search of its records pertaining to the 1-800 number allegedly used to accept notice of

wrong numbers discloses no incoming calls from the Hamburgers.  (Id. at ¶¶ 32-35.)

Finally, it claims that, after the April 2 conversation, Mr. Vega updated his company's

account notes for Henry Hamburger to state "WRONG PARTY NOT CONSUMER," and that

                                             6

Northland never called the Plaintiffs thereafter. (*Id.* at ¶¶ 23-24.) Plaintiffs deny these representations and argue that Northland called them again at 5:12 p.m. on April 2, exactly one minute after the conversation with Mr. Vega at 5:11 p.m. (Doc. 38-8 at ¶¶ 23-24.) This interpretation relies on the call log submitted by the Defendant and an affidavit from a representative with the third party service provider that Defendant used to place its calls. (*Id.* at ¶ 24.) However, the parties dispute whether Plaintiffs' interpretation of the call log is an accurate interpretation of the record or whether it misinterprets multiple entries which in actuality refer to the same call. (*See* Doc. 36 at ¶ 46 n.9 (discussing similar problems of interpretation, and arguing that only one April 2 call occurred).)

## V.    Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 265 (1986).  Once such a showing has been made, the nonmoving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695

(1990). "Inferences should be drawn in the light most favorable to the non-moving party,

and where the non-moving party's evidence contradicts the movant's, then the non-

movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d

1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts.  Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial.  The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact.  When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## VI.   Analysis

### a.   Consumer Debt

As a threshold issue, Defendant argues that none of Plaintiffs' FDCPA claims can

proceed because the Plaintiff cannot show that the Defendant's challenged practices "were

used in an attempt to collect a 'debt' as that term is defined in section 1692a(5) of the

8

FDCPA." (Def.'s Br. in Supp. of Mot. for Summ. J., Doc. 37, at 4.) Section 1692a(5) defines the term "debt" as follows:

The term "debt" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5). Defendants argue that, because "Plaintiffs have no personal knowledge regarding the purpose of the underlying obligation at issue" they have no way of knowing "whether the underlying obligation at issue was primarily for personal, family, or household purposes." (Doc. 37 at 7.)

The Court disagrees. The Plaintiffs have provided an affidavit of Henry Hamburger in which Mr. Hamburger claims personal knowledge of the charges made on the account and swears that he was present when each charge was made on the account. (*See* Henry Hamburger Aff. at ¶¶ 7-8.) He goes on to claim that all charges made on the account "were made for personal, family and household purposes such as the purchases made on the Account were for groceries, food at eating establishments, gasoline for a personal vehicle, and personal purchases at retail stores, including Wal-Mart and Best Buy." (*Id.* at ¶ 9.) While the affidavit is admittedly sparse and does not go so far as to claim that Henry Hamburger himself incurred the underlying debts, the Court cannot agree with the Defendant that these weaknesses make it so insufficient that it does not even raise a triable issue of fact for the jury. (*Cf.* Doc. 37 at 7-8 (summarizing weaknesses in the affidavit and

9

concluding that it "fails to meet the requirements of Rule 56(c)(4) and should not be considered by the Court").) In light of this Court's duty on summary judgment to view all genuine disputes of fact in the light most favorable to the nonmovant, the Court must accept Henry Hamburger's representations of personal knowledge and presence at the time the debts were incurred as true. This duty is especially pronounced here, where the moving Defendant does not point to record evidence contradicting the Hamburger Affidavit but merely argues that the Affidavit itself is insufficiently supported. Whether the Affidavit is ultimately persuasive is irrelevant for present purposes. At the summary judgment stage, all that matters is that it creates a dispute as to the status of the underlying obligation which can only be resolved at trial.

### b. 15 U.S.C. § 1692b(3) (Count I)

Plaintiffs' first claim is for a violation of section 1692b(3) of the FDCPA, which provides that

> [a]ny debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall . . . . not communicate with any such person more than once unless requested to do so by such person or unless the debt collector reasonably believes that the earlier response of such person is erroneous or incomplete and that such person now has correct or complete location information . . . .

15 U.S.C. § 1692b(3). "The term 'location information' means a consumer's place of abode and his telephone number at such place, or his place of employment." *Id.* at § 1692a(7).

The clear terms of this section do not apply to the facts of this case. The section regulates communications "for the purposes of acquiring location information about the

10

consumer." Nonetheless, the summary judgment record, as recounted above, shows that the purpose of the calls was not to acquire information about Henry Hamburger, but only to contact him at what Defendant believed at the time to be his correct abode and phone number. Plaintiffs admit as much in their Brief in Opposition, when they write: "Clearly, when calling Plaintiffs, Defendant was not seeking location information about Henry, as Plaintiffs had already informed it that it was calling the wrong number and Defendant does not contend it was calling Plaintiffs to acquire location information about Henry Hamburger." (Pls.' Br. in Opp. to Mot. for Summ. J., Doc. 38, at 8-9.)

This admission that "clearly" an element of the alleged statute does not apply to Plaintiffs' case would be sufficient to grant summary judgment. Perhaps sensing this, Plaintiffs then filed a Sur-Reply Brief in which they abandoned their "clear" position and adopted the opposite stance, with the same level of categorical certainty. Their new position holds that "when calling any of [Henry Hamburger's] five (5) numbers, Defendant's intent and purpose was to acquire location information for Henry Hamburger, because it did not have his current home telephone number." (Pls.' Sur-Reply to Mot. for Summ. J., Doc. 46, at 8.) No explanation is given for the sudden reversal.

The Court, however, cannot accept Plaintiffs' newest position when that position is utterly devoid of support from the record. The Plaintiffs' own deposition testimony consistently indicates that the Defendant's calls were meant to contact Henry Hamburger, not to find out where he might be located or to procure additional information about him.

(*See, e.g.,* Irene Hamburger Dep., Doc. 37-5, at 26:3-4 (recounting Northland message as saying, "Something about, 'This is for Henry, and if you're not Henry, push 2.'"). Indeed, this was Plaintiffs' position until they filed their Sur-Reply. (*See, e.g.,* Doc. 38-8 at ¶ 29 ("Plaintiff Irene Hamburger testified that they were receiving collection calls from two companies, one of which was the Defendant and Defendant was calling for Henry Hamburger.").

Moreover, the substance of the arguments asserted in Plaintiffs' Sur-Reply cannot defend against summary judgment. Plaintiff argue that Defendant must have been seeking location information, because it was not possible that all five of the telephone numbers that Defendant had on file could "be current telephone numbers for Henry Hamburger;" that the Plaintiffs had put Defendant verbally on notice that Henry Hamburger did not reside with them; and that the Plaintiffs' answering machine message indicated that no one named Henry lived at the residence. [4]  (Doc. 46 at 8.)

But even if each of these facts, accepted as true for summary judgment purposes, did put Defendant on notice that Henry did not live at the residence contacted, it does not necessarily follow that the Defendant must have been seeking location information, in the

---

[4] The "answering machine" argument is a strange one, and appears to contradict Irene Hamburger's deposition testimony. In response to the question "Does your home phone number have an answering machine?," Mrs. Hamburger answered "No." (Irene Hamburger Dep. at 16:3-5.) However, Mrs. Hamburger's own affidavit states the contrary: "In those instances when I do not answer my home telephone, the call is transferred to my answering machine. My answering machine has a greeting that states, 'Hi, this is Butch and Irene. Leave a message." (Irene Hamburger Aff., Doc. 38-5, at ¶¶ 5-6.) Fortunately, this Court need devote no further judicial resources to the question of whether Irene Hamburger has an answering machine. Even if she did, and even if the Defendant's representative listened to her message and interpreted it as providing an exhaustive list of all her co-habitants, this still does not imply that Northland's later calls were oriented toward acquiring location information, as discussed in the sentences that follow.

absence of any record evidence indicating that such was in fact the case. In noting this, the Court is guided by the principle that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512. Here, the Plaintiffs do not even advance a scintilla of evidence to conclude that location information was the motive for the calls. They only advance the *logical possibility* that it could have been the motive, when other motives are equally possible and when everything else in the record indicates that it was not the motive. For instance, it is equally possible that, even if Defendant were on notice that it was calling the wrong number, its continued calls were motivated by, for instance, carelessness, disregard of previously received information, or an intent to harass, and not to acquire location information. If so, the Defendant could be found liable under other sections of the FDCPA, but it could not be liable under section 1692b(3).

Therefore, summary judgment is granted as to Count I.[5]

---

[5] Defendant also claims that the Plaintiffs, as third parties to the underlying debt and not the actual consumer, do not have standing to assert a claim under section 1692b(3). (Doc. 37 at 8-9.) A decision on this issue is not necessary to resolve the Motion as to Count I. Nonetheless, the Court does not believe at this point that Defendant's interpretation is supported by the clear meaning of the statute, which does in fact appear framed to protect third parties like the Plaintiffs. "The question of standing . . . . concerns, apart from the 'case or controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S. Ct. 827, 830, 25 L. Ed. 2d 184 (1970). Thus, if the statute is meant to protect the Plaintiffs—as it appears on its face to do—the Plaintiffs would have standing to assert.

### c. 15 U.S.C. § 1692c(a)(1) (Count II)

Count II is alleged in the Complaint as a violation of section 1692c(a)(1) of the

FDCPA. This section prohibits communications

> with a consumer in connection with the collection of any debt . . . . at any
> unusual time or place or a time or place known or which should be known to
> be inconvenient to the consumer. In the absence of knowledge of
> circumstances to the contrary, a debt collector shall assume that the
> convenient time for communicating with a consumer is after 8 o'clock
> antemeridian and before 9 o'clock postmeridian, local time at the consumer's
> location . . . .

15 U.S.C. § 1692c(a)(1).

The Court agrees with the Defendant that, unlike in Count I, *see supra* note 5, the

Plaintiffs are not within the zone of interest regulated by section 1692c(a)(1), which

concerns communications with the consumer and does not affect the interests of third

parties. Plaintiffs, however, appear to have withdrawn this claim, in that they state in their

Brief in Opposition that "Plaintiffs withdraw their claim against Defendant for a violation of 15

U.S.C. § 1692c(b)." (Doc. 38 at 8 n.1.) But there is no section 1692c(b) claim in the

Complaint: the only 1692c claim is that alleged under 1692c(a)(1), which uses wholly

different language from 1692c(b). (*See* Compl. at ¶¶ 34-47.) Plaintiff nonetheless does not

contest any of Defendant's arguments on section 1692c(a)(1), which indicates that this is

the claim that Plaintiff meant to withdraw. The Court need not further untangle this

procedural knot because the lack of standing makes summary judgment appropriate

whether Plaintiff withdrew this claim or not.

Therefore, the Court will grant summary judgment as to Count II.

### d. 15 U.S.C. § 1692d, 1692d(5) (Count III)

FDCPA section 1692d provides that a "debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. "Without limiting the general application of the foregoing," the section then enumerates six types of violations. *Id.* These include "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." *Id.* at § 1692d(5). The applicable regulations define "continuously" as "making a series of telephone calls, one right after the other" and define "repeatedly" as "calling with excessive frequency under the circumstances." Statement of General Policy of Interpretation Staff Commentary on the Fair Debt Collection Practices Act 53 Fed. Reg. 50,097 (Dec. 13, 1988).

On summary judgment, the Court views all genuine disputes of material fact in the light most favorable to the non-moving Plaintiffs. Because the Defendant's intent to annoy, abuse, or harass is a subjective state of mind known only to the Defendant, it necessarily eludes the presentation of concrete evidence. Accordingly, it will almost always present a dispute of material fact, and the Court concludes that it does so here as well.

The operative question then becomes whether genuine disputes can exist over whether Defendant's conduct, viewed in the light most favorable to the Plaintiffs, "had the

15

natural consequence" of harassment, oppression, or abuse, which could arise from repeatedly or continuously calling the Plaintiffs in such a manner that a factfinder could reasonably infer an intent to annoy, abuse, or harass the Plaintiffs. On this issue, the Court cannot say as a matter of law that the no violation of section 1692d occurred. While the number and frequency of the calls are low even under the facts as Plaintiffs assert them, and while the content of the calls does not appear outrageous on its face, the Court cannot conclude at this stage that the pattern of calls was so benign as to preclude the application of section 1692d on summary judgment. Sufficient facts exist from which the factfinder could infer a violation of 15 U.S.C. 1692d and 1692d(5). Therefore, whether Defendant's conduct falls within the scope of section 1692d remains a triable issue of fact to be resolved by the jury.

Therefore, the Court will deny summary judgment as to Count III.

### e. 15 U.S.C. § 1692f (Count IV)

FDCPA section 1692f provides that a "debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. Though the section provides a non-exhaustive list of examples of violations, Plaintiffs do not rely on any of these. They rely instead on the argument that "Defendant violated § 1692f of the FDCPA by failing to update its records to stop the collection calls to Plaintiffs." (Compl. at ¶ 37(b); *see also* Doc. 38 at 17.)

The question of whether failing to update records and continuing to call the

Plaintiffs—if accepted as true—goes so far as to be labelled "unfair or unconscionable" is

another question of fact for the jury. The jury could certainly reject this characterization as

extreme. But based on the facts before the Court, there is no basis to find that the jury must

as a matter of law reject Plaintiffs' characterization, if, for instance, the jury found that the

Defendant placed multiple calls *after* Plaintiffs told them to stop and/or that these calls

occurred in a compressed span of time, both of which are material and disputed facts.

Therefore, the Court will deny summary judgment as to Count IV.

### f. Intrusion upon Seclusion (Count V)

Finally, Plaintiffs bring a pendent state-law claim for invasion of privacy by intrusion

upon seclusion. "Pennsylvania has adopted the definition for intrusion upon seclusion

invasion of privacy as set forth by the Restatement (Second) of Torts, § 652B[.]" *Desmond*

*v. Phillips & Cohen Assocs., Ltd.*, 724 F. Supp. 2d 562, 568 (W.D. Pa. 2010). The

Restatement definition holds that "[o]ne who intentionally intrudes, physically or otherwise,

upon the solitude or seclusion of another or his private affairs or concerns, is subject to

liability to the other for invasion of his privacy if the intrusion would be highly offensive to a

reasonable person." *Larsen v. Philadelphia Newspapers, Inc.*, 543 A.2d 1181, 1186-87 (Pa.

Super. Ct. 1988) (quoting Restatement (Second) of Torts, § 652B).

> The Restatement explicitly provides that there is no liability for knocking at
> someone's door, or calling him to the telephone on one occasion, or even two
> or three, to demand payment of a debt. Rather, it is only when the telephone
> calls are repeated with such persistence and frequency that the behavior

17

rises to the level of a substantial burden to one's existence such that his privacy is invaded.

*Desmond*, 724 F. Supp. at 568-69 (citing Restatement § 652B, cmt. d).

As before, the jury could be skeptical that approximately seven or eight calls over the course of several weeks "rises to the level of a substantial burden to [the Hamburgers'] existence." However, for the same reasons discussed above, the Court is unwilling to say as a matter of law that no reasonable factfinder could so conclude. The questions of whether the number and frequency of the calls and whether these calls were placed after the Defendant was instructed to stop calling the Plaintiffs rise to the level of an intrusion upon seclusion are all disputed issues of fact that can only be determined at trial. Again, the Court is unwilling to resolve what are essentially factual disputes as a matter of law.

Therefore, the Court will deny summary judgment as to Count V.

## VII.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 35) is **GRANTED IN PART AND DENIED IN PART**. A separate Order follows.

Robert D. Mariani
United States District Judge