## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IRENE HAMBURGER and<br>HOWARD HAMBURGER, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | 3:13-CV-01155 |
| | : | (JUDGE MARIANI) |
| NORTHLAND GROUP, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.     Introduction

Presently before the Court is Defendant Northland Group's Motion for Attorney's

Fees and Costs pursuant to 28 U.S.C. § 1927, 15 U.S.C. § 1692k(a)(3), and the Court's

inherent power to sanction misconduct (Doc. 86). The Motion follows a jury verdict in favor

of the Defendant on all counts, after a trial in this Fair Debt Collection Practices Act

("FDCPA") action. For the reasons that follow, the Court will deny the Motion.

### II.    Factual Background and Procedural History

The Plaintiffs are Howard and Irene Hamburger, a husband and wife. Mr. and Mrs.

Hamburgers filed a Complaint on April 30, 2013 alleging causes of action under the FDCPA

and Pennsylvania tort law. (*See* Compl., Doc. 1.) The Complaint alleged that Defendant

Northland Group, Inc. repeatedly called the Plaintiffs to collect a debt of a third party

identified only as "Henry." (*See* Compl. at ¶¶ 10, 15.) It further alleged that "[n]either Plaintiff

is named Henry nor do they know an individual by that name." (*Id.* at ¶ 16.) Nonetheless,

the Complaint claimed that Northland called the Hamburgers every day to collect Henry's debt, including "on occasion more than once in a single day," and that these calls continued even after Defendant was informed that no one named Henry lived at the Hamburgers' residence, and that it accordingly should stop calling about his debt. (*See id.* at ¶¶ 12-18, 22-25.)

After discovery, these allegations began to unravel. First, Plaintiffs' claim that they do not know any person named Henry was shown to be categorically untrue: the Plaintiffs' son is named Henry Hamburger. (*See, e.g.,* Mem. Op., Feb. 12, 2015, Doc. 50, at 2.) Howard Hamburger admitted during his deposition that the automated calls alleged in the Complaint said "We're looking for Henry Hamburger." (Howard Hamburger Dep., Oct. 3, 2013, Doc. 37-8, at 16:24.) This admission makes clear that, from the very onset of this case there could never have been any confusion as to whom Defendant actually sought; Northland already gave Howard the full name of the debtor, which happened to be the exact name of his son. Thus, the Complaint contained known false allegations.

Next, on March 21, 2014, Henry Hamburger signed an artfully evasive affidavit. (*See* Henry Hamburger Aff., Mar. 21, 2014, Doc. 37-3.) Henry's Affidavit does not admit that he incurred any actual debts, but states that, if he happened to do so, any debt would have been a personal, non-business debt—which was a necessary element of his parents' FDCPA claims. (*See generally id.*) He further claimed therein that he "has personal knowledge regarding the charges on [his credit credit] card" and went on to recite what

2

kinds of purchases were made on that card. (*See id.* at ¶¶ 8-10.) But he did not state where he obtained that knowledge or whether he made the personal charges on his own credit card that he purportedly knew about. (*See id.*) Numerous deficiencies existed with this Affidavit which—as Defendant's Motion in Limine to Exclude Evidence and our Opinion ruling on that Motion made clear, (*see* Docs. 57; 62)—created obstacles to presenting any of its information at trial. Perhaps recognizing these defects, Plaintiffs agreed, on the eve of trial, to stipulate that the debt was in fact a consumer debt. (*See, e.g.*, Pls.' Br. in Opp. to Mot. for Att'y Fees, Doc. 92, at 3 n.1.) It is not clear what—if anything—changed such that Plaintiffs were finally able at the last moment to admit to the nature of the debt, when they could not do so during the previous two years of litigation.

We first considered the merits of Plaintiffs' claims on summary judgment. In our Summary Judgment Opinion, issued on February 12, 2015, we summarized the undisputed material facts as follows:

> Defendant opened an account for a third party credit card company to collect debts incurred by Henry Hamburger. (Doc. 36 at ¶ 1.) In an attempt to collect these debts, Defendant made multiple calls to Plaintiffs Howard and Irene Hamburger at their home telephone number, beginning in or around March 2013. (*See id.* at ¶¶ 8-12.) The calls specified that they were intended for Henry Hamburger. (*See* Doc. 38-8 at ¶ 29.) The parties dispute the number of calls that were placed and whether those calls were answered. (*Cf. generally* Doc. 36 at ¶¶ 12-20; Doc. 38-8 at ¶¶ 12-20.) However, the parties agree that on April 2, 2013, a man at Howard and Irene's phone number spoke with Northland debt collector Nilton Vega and informed Mr. Vega that Northland was calling the wrong number. (Doc. 36 at ¶ 22; Doc. 38-8 at ¶ 22.)
> Plaintiffs admit that they "were receiving telephone calls from collection agencies other than Northland during between January 2013 and April 2013." (Doc. 36 at ¶ 38.) To differentiate Northland from these other collectors, Irene

3

Hamburger testified to having recorded Northland's number each time it called "because it called so many times," but she "is unable to locate the piece of paper" providing this record. (*See* Doc. 38-8 at ¶ 37.)

(Doc. 50 at 3-4 (internal footnote omitted).)

We then found that several material disputes of fact precluded summary judgment.

First, there was a dispute about how many calls were placed. (*See id.* at 4.) Defendant cited its Account Notes for Henry Hamburger to show that it only placed five calls to Plaintiffs' phone number, on March 11, March 14, March 25, March 29, and April 2, 2013. (*Id.*) Plaintiffs, on the other hand, claimed that Defendant called them "at least seven or eight times." (*Id.*) Their only evidence for this was their personal recollections and a supposed call log where Irene Hamburger claims that she "logged or wrote down" each call that came in. (*Id.*) Throughout the entire litigation, Plaintiffs never produced the call log and claimed at trial that they somehow lost it.

Second, the parties also disputed how many calls led to conversations and when and how the Plaintiffs instructed Defendant to stop calling. (*Id.* at 5.) Defendant represented that all calls except the last one were automated, and that it was only on the final call that Plaintiffs spoke with a human representative, Nilton Vega, and instructed him to stop calling. (*Id.*) Plaintiffs, on the other hand, argued that they had multiple conversations with Northland representatives and even requested to be taken off Northland's call list by going through Northland's automated removal system. (*Id.* at 5-7.) Much of Plaintiffs' argument on this point relied on interpretations of Northland's call log. The Court recognized that their

4

arguments may have misinterpreted the actual text of the log, but still determined that we could not resolve these disputes on the summary judgment record. (*See id.* at 5, 7.)

Given the state of this factual record, we granted summary judgment on the counts that were clearly legally precluded, (*see id.* at 10-14), but allowed Plaintiffs to proceed to trial on their claims for violations of 15 U.S.C. §§ 1692d and 16292f and for the pendent state-law claim of invasion of privacy by intrusion upon seclusion, (*see id.* at 14-18). The claims that survived summary judgment only did so because Plaintiffs' counsel represented to us that the material disputes of fact listed above were actually genuine material disputes.

At trial, Plaintiffs produced virtually no evidence beyond the summary judgment record. Despite an existing dispute over the number of phone calls that Plaintiffs received from Northland, they did not produce any phone records from their telephone service provider to substantiate their claims. Indeed, it appears that they never sought any discovery of these records at all. Instead, they continued to rely only on Irene and Howard Hamburger's unsupported recollections of events and on the call log that Irene created and then purportedly lost. During a sidebar conference, Plaintiffs' counsel described this attempt to rely on hazy conjecture instead of objective telephone-record evidence as "litigation strategy."

Irene Hamburger also testified at trial that she created the lost call log by transcribing the date and time from Northland phone numbers as each appeared on her Caller ID.

Plaintiffs listed some of these dates and times in their Answer to Defendant's Interrogatory number 8, which was propounded during pretrial discovery. The times listed there are precise to the hour and minute. (*See* Pls.' Answs. To Def.'s Interrogatories, Doc. 87-6, at 3-4.) Plaintiffs represented in the Interrogatories and at trial that Northland called them at least on these dates and times, though they added that "there were other dates that Defendant contacted them; however, they cannot remember the dates of those calls." (*Id.* at 4.) But most of those calls listed in response to Interrogatory 8 are merely transcriptions from Northland's own call log, which was provided to the Plaintiffs at an earlier period of discovery. (*See* Def.'s Reply Br. in Supp. of Mot. for Sanctions, Doc. 95, at 4 n.2; Northland Call Log for Henry Hamburger, Doc. 87-1.) The fact that Plaintiffs merely copied Northland's log and did not generate their own response is evidenced by the fact that Plaintiffs claim that Northland placed a call to them on March 11, 2013 at 5:34 p.m. (*See* Doc. 87-6 at 3.) The Northland log shows a call at this time, but the immediately following entry directs the reader to ignore this notation, stating that it was entered in error, as no call was placed. (*See* Doc. 87-1 at 12; *see also* Greg Gruett Aff., May 2, 2014, Doc. 37-1, at ¶ 10 ("Northland errantly loaded a Global Connect upload and notation twice for the March 11, 2013 call. . . . Northland's account notes contain[] a notation noting the error and advising to ignore the duplicate system entry occurring at 5:34 p.m. in relation to the March 11, 2013 call made at 5:04 p.m."). The Plaintiffs and their attorneys apparently did not notice the follow-up notation and claimed that they were called at 5:34 p.m. anyway.

6

But most damning of all, evidence was submitted at trial establishing that all of Northland's log entries were done in Central Time. Plaintiffs, as Pennsylvania residents, live in the Eastern Time Zone. Therefore, if Plaintiffs simply transcribed the call times from their Caller ID—as they testified that they did under oath at trial—then each of the times listed in Interrogatory 8 would be in Eastern Time, i.e., one hour later than the times in Northland's call log. But instead, the times submitted in Interrogatory 8 correspond to the exact hour and minute of those in Northland's call log, without taking the time-zone difference into account. It appears, then, that Plaintiffs and their attorneys simply copied the records that they had already received in discovery—including what they did not realize was an errant call entry— and then passed the result off to Defendant, the jury, and this Court as if it were the Hamburgers' own recollection. But in so doing, they did not realize that they would need to convert Northland's call records to Eastern Time to make their false statements believable.

Finally, despite the fact that Interrogatory 8 references "other dates that Defendant contacted them," no evidence was produced at trial to indicate that other calls actually occurred.

After a short deliberation, the jury returned a verdict in favor of the Defendant on all counts. (*See* Special Verdict Questions, Doc. 80.) Defendant then submitted the instant Motion for Attorney's Fees and Costs. Defendant represents that its fees and costs "will likely exceed $75,000." (Def.'s Br. in Supp. of Mot. for Att'ys' Fees and Costs, Doc. 87, at 16 n.7). Plaintiffs dispute Defendant's entitlement to fees and costs, arguing instead that the

Hamburgers were simply on the losing side of a good faith dispute between litigants. It is to these issues that the Court now turns.

## III.   Analysis

### a.  Legal Standards

Under the so-called "American Rule" of fee-shifting, the prevailing party to a lawsuit is typically not entitled to receive attorneys' fees or costs from the loser. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S. Ct. 1612, 1616, 44 L. Ed. 2d 141 (1975). However, certain statutory provisions and judicially-crafted remedies create exceptions to this general rule. Defendant asserts three exceptions that it believes entitles it to attorneys' fees and costs.

First, the FDCPA provides in part: "On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs." 15 U.S.C. § 1692k(a)(3).

Second, and more generally, Congress provided that:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. "As is evident from the text of the statute, § 1927 requires a court to find an attorney has (1) multiplied proceedings; (2) in an unreasonable and vexatious manner;

8

(3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by

intentional misconduct." *In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*,

278 F.3d 175, 188 (3d Cir. 2002). "Although a trial court has broad discretion in managing

litigation before it, the principal purpose of imposing sanctions under 28 U.S.C. § 1927 is

'the deterrence of intentional and unnecessary delay in the proceedings.'" *Zuk v. E.*

*Pennsylvania Psychiatric Inst. of the Med. Coll. of Pennsylvania*, 103 F.3d 294, 297 (3d Cir.

1996) (quoting *Beatrice Foods v. New England Printing*, 899 F.2d 1171, 1177 (Fed. Cir.

1990)). "Inasmuch as § 1927 addresses the impact conduct has on the proceedings,

sanctions that are imposed under § 1927 must only impose costs and expenses that result

from the particular misconduct." *In re Prudential*, 278 F.3d at 188.

Third, even if neither of these statutory schemes apply,

"Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L. Ed. 242 (1821); *see also Ex parte Robinson*, 19 Wall. 505, 510, 22 L. Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631, 82 S. Ct. 1386, 1388-1389, 8 L. Ed. 2d 734 (1962).

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 2132, 115 L. Ed. 2d 27

(1991). This includes the power to "assess attorney's fees when a party has 'acted in bad

faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* at 45-46 (quoting *Alyeska*, 421

U.S. at 258-59). Our power here stems broadly from "a court's inherent power to police

9

itself" and thereby to sanction a culpable party if "fraud has been practiced upon [the court], or [if] the very temple of justice has been defiled." *Id.* at 46 (quoting *Universal Oil Prods. Co. v. Root Ref. Co.*, 328 U.S. 575, 580, 66 S. Ct. 1176, 1179, 90 L. Ed. 1447 (1946)). Assessing attorneys' fees and costs in such circumstances serves "the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." *Id.* (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n.14, 98 S. Ct. 2565, 2573 n.14, 57 L. Ed. 2d 522 (1978) (internal alterations and quotation marks omitted)).

We do not take our ability to override the American Rule and assess costs and fees against the losing party lightly. District courts in Pennsylvania have noted that 15 U.S.C. § 1692k(a)(3) " should be construed narrowly so as not to discourage private litigation under the FDCPA," given that the "[t]he limited purpose of this provision is to discourage malicious and harassing lawsuits by consumers." *Kondratick v. Beneficial Consumer Discount Co.*, Civ. No. 04-4895, 2006 WL 305399, at *10 n.4 (E.D. Pa. Feb. 8, 2006) (quoting *Ayres v. Nat'l Credit Mgmt Corp.*, Civ. No. 90-5535, 1991 WL 274695, at *1 (E.D. Pa. Dec. 17, 1991)). Likewise, "[a]lthough § 1927 provides a court with a mechanism for sanctioning vexatious and willful conduct, 'courts should exercise this sanctioning power only in instances of a serious and studied disregard for the orderly process of justice.'" *LaSalle Nat'l Bank v. First Connecticut Holding Group, LLC*, 287 F.3d 279, 288 (3d Cir. 2002) (quoting *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir. 1986) (internal alterations omitted)).

Finally, when we exercise our inherent powers, "[b]ecause of their very potency" and their amorphous nature, we must do so only "with restraint and discretion." *Chambers*, 501 U.S. at 44.

### b. Section 1692k(a)(3)

In light of the above standards, we cannot find that Defendant is entitled to attorneys' fees or costs under 15 U.S.C. § 1692k(a)(3).

Under that section's clear wording, the Defendant is only entitled to fees and costs if a case is "*brought* in bad faith or for the purpose of harassment." 15 U.S.C. § 1692k(a)(3) (emphasis added). But here, it does not appear that the Hamburgers brought this case for any reason other than satisfying a perceived grievance. Their trial testimony insisted that they did in fact receive multiple harassing phone calls from debt collectors. Their entire strategy throughout litigation had been to receive compensation for this conduct. But their case's fatal flaw was simply that, while they may indeed have been repeatedly contacted by *some* debt collectors, they had no evidence supporting their attempt to blame all of that conduct on Northland. In other words, their case arose out of what appears to be a legitimate grievance, though the subsequent litigation over it was poorly prepared, sloppily executed, and devoid of evidentiary support for the sweeping claims against Northland. The FDCPA is not designed to penalize such litigants, who litigate honest grievances but utterly fail to prove them.

11

### c. Section 1927

Defendant's claim for fees and costs under 28 U.S.C. § 1927 likewise fails, as there is no evidence that Plaintiffs' attorneys "multiplied the proceedings" through any sort of delaying tactics.

Defendant's argument here turns on the proposition that Plaintiffs' attorneys knew or reasonably should have known that the claims they "pursued [were] frivolous, or that [their] litigation tactics will needlessly obstruct the litigation of nonfrivolous claims." (Doc. 87 at 10 (quoting *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1230 (6th Cir. 1986)). In other words, Defendant seems to assert that the entire lawsuit was brought frivolously insofar as it was never supported by any evidence, and that therefore all proceedings were unwarranted, unnecessary, and vexatious.

Northland may well be correct that the lawsuit was unwarranted from its initiation. Plaintiffs' case appears to have always lacked evidentiary support: a fact that counsel should have realized. Nonetheless, our own Third Circuit has held that section 1927 "does not apply" to a situation where sanctions are sought "not because of any multiplicity of the proceedings or delaying tactics, but for failure to make a reasonably adequate inquiry into the facts and law before filing the lawsuit." *Zuk*, 103 F.3d at 297. Thus, counsel's incompetence in screening, investigating, and litigating this case does not give rise to section 1927 sanctions.

It may be argued, however, that counsel unnecessarily multiplied the proceedings by relying on the fraudulent call history to avoid summary judgment. (*See* pp. 5-7, *supra*; a discussion of the sanctionability of this conduct follows at section III(d), *infra*.) But our decision to deny summary judgment and proceed to trial did not turn on fraudulent records. Instead, the dispute of fact warranting trial stemmed from Irene Hamburger's testimony that "she 'logged or wrote down' 'about seven or eight [calls] that I remember.'" (Doc. 50 at 4 (quoting Irene Hamburger Dep., Doc. 37-5, at 22:3-6).) Because she claimed to remember more calls than were reflected in Northland's records, we found that the case could not be decided on summary judgment. (*See, e.g.*, *id.* at 16, 18.) This was a dispute not only about existing call logs, but also about Irene Hamburger's own memory of background events. Even if she had not claimed to writing these calls down, she had still testified to "remembering" seven or eight calls, which would have still remained a triable issue of fact. There is no evidence that the Hamburgers' personal recollection of events was fabricated; they may well have received excessive calls from other debt collectors, and accurately remembered receiving those calls, even if the evidence shows that those calls did not come from Northland. (*Cf., e.g.*, Doc. 50 at 3; Doc. 95 at 5.)

Therefore, as poorly as Plaintiffs' attorneys acted over the course of this case, they did not unduly multiply the proceedings and, as such, their misconduct falls outside the scope of section 1927.

### d. Inherent Power

Defendant is at its strongest when it argues in favor of sanctions under our inherent power. The evidence strongly suggests that the Hamburgers and their attorneys lied when they claimed the times listed in Interrogatory 8 were transcriptions from Irene Hamburger's Caller ID. It also strongly suggests that the Plaintiffs' attorneys knowingly submitted false evidence to the Court. The Court agrees with the Defendant that, due to the complicated nature of Northland's call records, the Plaintiffs' attorneys would likely have had to explain to the Hamburgers what the document actually said. Then, in order to get the Hamburgers to say that Northland called them at the exact times listed in the records, their attorneys would have had to point out the times that the attorneys believed (erroneously, in some cases) that the record showed that Northland called them.

Moreover, Plaintiffs' attorneys should have known that the times recorded in Northland's call log were listed in Central Time and the Hamburgers' Caller ID would reflect Eastern Time. Thus, even if the attorneys did not actually spoonfeed the Hamburgers the answers that they then listed in Interrogatory 8, and even if the Hamburgers actually came up with those responses themselves, their attorneys should have known that the information they received from their clients was untrue.

So, whichever way we analyze the situation, Defendant has met its burden in proving that the Plaintiffs and their attorneys submitted evidence to this Court that they either knew or reasonably should have known was untrue.

14

Nonetheless, we do not believe that assessing attorneys' fees and costs for this misconduct is a proper exercise of our obligation to only exercise our inherent powers "with restraint and discretion." *Chambers*, 501 U.S. at 44. This is so for two interrelated reasons.

First, these false statements did not affect the actual proceedings. As discussed above, they did not cause delay; the litigation would have proceeded to trial even if the Plaintiffs did not make false statements. And because the jury went on to reject Plaintiffs' claims in their entirety, Defendant suffered no actual prejudice from the Plaintiffs and their attorneys' misconduct.

Of course, prejudice is not a prerequisite to the exercise of our inherent power. We have the power to police our own proceedings and to punish a person who submits false information to us, even if those acts did not have any effect. *Cf. id.* at 46. Still, it is also true that the actual extent of the fraud in our case was *de minimis*. Only one of the calls listed in Plaintiffs' response to Interrogatory 8—that on March 11, 2013 at 5:34 p.m.—can actually be shown to have not happened, as the Northland call log specifically states that it was made in error. (*See* Doc. 87-1 at 12.) But even Defendant admits that the other calls on March 11, March 14, March 25, March 29, and on April 2 at 5:11 p.m. actually occurred, albeit one hour later than Plaintiffs claim that they did. (*See* Doc. 87 at 3 (citing Doc 87-1 (Henry Hamburger Call Log) and 87-2 (Global Connect Call History)).) The falsity of Plaintiffs' statements comes from the fact that they claimed to personally remember these calls and claimed that they occurred at the listed times in Eastern Time. While this has been

shown to be untrue, there is no dispute that Defendant did actually call the Plaintiffs on those five dates at the times listed in Northland's call log in Central Time.

Therefore, we are faced with clearly established fraud that had no actual effect on the proceedings and was very limited in scope. We deplore counsel's conduct for allowing such obviously untrue evidence to be presented to us. But at the same time, Defendant's demands for sanctions in the form of fees, which "will likely exceed $75,000," (Doc. 87 at 16 n.7), is out of proportion to the wrongs committed. The false statements were made in the course of a case that was litigated in a consistently poor manner and was lacked evidentiary support from its inception. They are, if anything, simply a more extreme example of Plaintiffs' counsel's sloppy litigation tactics. But we remain unconvinced that counsel's poor performance justifies the substantial sanctions that Defendant seeks.

## IV.   Conclusion

For the foregoing reasons, Defendant's Motion for Attorneys' Fees and Costs (Doc. 86) is **DENIED**. A separate Order follows.

Robert D. Mariani
United States District Judge